**[J-38A-2024 and J-38B-2024] [MO: Todd, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| STEVEN MATOS, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF JESSICA L. FREDERICK, DECEASED | : | No. 93 MAP 2023 |
| | : | |
| | : | Appeal from the Order of the Superior Court at No. 1189 MDA 2021 entered on March 10, 2023, Affirming and Remanding the Order of the Columbia County Court of Common Pleas, Civil Division, at No. 1067-CV-2013 entered on June 15, 2021. |
| v. | : | |
| | : | |
| | : | |
| | : | |
| GEISINGER MEDICAL CENTER; MICHAEL H. FITZPATRICK, M.D.; RICHARD T. DAVIES, JR., PA-C; ALLEY MEDICAL CENTER; DAVID Y. GO, M.D. AND KYLE C. MAZA, PA-C | : | |
| | : | ARGUED: May 14, 2024 |
| | : | |
| | : | |
| | : | |
| APPEAL OF: ALLEY MEDICAL CENTER, DAVID Y. GO, M.D., AND KYLE C. MAZA, PA-C | : | |
| | : | |
| | : | |
| STEVEN MATOS, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF JESSICA L. FREDERICK, DECEASED | : | No. 94 MAP 2023 |
| | : | |
| | : | Appeal from the Order of the Superior Court at No. 1190 MDA 2021, entered on March 10, 2023, Affirming and Remanding the Order of the Columbia County Court of Common Pleas, Civil Division, at No. 1067-CV-2013 entered on June 15, 2021. |
| v. | : | |
| | : | |
| | : | |
| | : | |
| GEISINGER MEDICAL CENTER; MICHAEL H. FITZPATRICK, M.D.; RICHARD T. DAVIES, JR., PA-C; ALLEY MEDICAL CENTER; DAVID Y. GO, M.D. AND KYLE C. MAZA, PA-C | : | |
| | : | ARGUED: May 14, 2024 |
| | : | |
| | : | |
| | : | |
| APPEAL OF: GEISINGER MEDICAL CENTER; MICHAEL H. FITZPATRICK, M.D.; AND RICHARD T. DAVIES, JR., PA-C | : | |

**DISSENTING OPINION**

**JUSTICE WECHT**                                      **DECIDED:  April 25, 2025**

The Mental Health Procedures Act[1] establishes rights and processes concerning examination and treatment for three categories of mental health patients: voluntary inpatient, involuntary inpatient, and involuntary outpatient.[2]  Voluntary treatment of outpatients falls outside the scope of the Act.[3]  Identification of the point in time at which a patient ceases to be a voluntary outpatient, whose care lies outside the scope of the Act, and becomes instead a voluntary inpatient, whose care is governed by the Act, is a process specified by the Act itself.  Today's Majority holds that a person's "volitional act of requesting inpatient treatment at a facility commences the entire voluntary inpatient treatment process" and triggers potential liability under the Act.[4]  This is incorrect.

The Majority's interpretation disregards critical components of the Act and judicially re-writes the process established by the General Assembly for a person to become a voluntary inpatient.  Contrary to the Majority's view, the Act creates its own procedures, and predicates a voluntary inpatient's examination and treatment upon several prerequisites, none of which is alleged to have occurred here.  The patient, Westley Wise, was and remained a voluntary outpatient whose care did not fall within the scope of the MHPA.

As the Majority details, Wise presented himself at the emergency departments of Geisinger Medical Center ("Geisinger") and Alley Medical Center ("Alley"), pleading to be

---

[1]     50 P.S. §§ 7101-7503 (hereinafter, the "MHPA" or "the Act").

[2]     Id. § 7103.

[3]     *Leight v. Univ. of Pittsburgh Physicians*, 243 A.3d 126, 130 (Pa. 2020) (recognizing that "the voluntary treatment of outpatients falls outside the scope of the MHPA").

[4]     Maj. Op. at 30.

admitted for voluntary inpatient psychiatric treatment. First Geisinger, and then Alley, refused admission. Rejected from inpatient admission, Wise killed Jessica Frederick and attempted to kill himself. The administrator of Frederick's estate[5] sued Geisinger and Alley, alleging gross negligence in their respective examinations and discharges of Wise under Section 114 of the MHPA.[6]

Because this claim is rooted in Wise's examination under the Act, Frederick's estate must establish that Wise became a voluntary inpatient whose care is governed by the Act. The Act and its implementing regulations establish a number of prerequisites to becoming a voluntary inpatient, including a written application and acceptance for admission. In this case, it is undisputed that there was no written application or acceptance. Because these prerequisites did not occur, Wise did not become a voluntary inpatient. At all relevant times, Wise remained a voluntary outpatient whose care fell outside the scope of the Act.

Prior to enactment of the MHPA, commitment-based treatment models prevailed nationwide, resulting in mass confinement of mentally ill persons and concomitant deprivation of their individual rights. Under this paternalistic standard, states reserved the "authority to involuntarily commit a mentally ill individual for the good of society, to protect others from harm," as well as to "act for the good of the individual, to mandate inpatient treatment for mental illness when doctors believed that such treatment was necessary to restore the individual's health."[7] Pennsylvania's Mental Health Act of 1951

---

[5] The complaint that underlies this appeal was commenced and maintained by Steven Matos, both individually and in his capacity as administrator of Frederick's estate. For ease of reference, I generally refer herein to that estate rather than to Mr. Matos.

[6] 50 P.S. § 7114.

[7] Steven B. Datlof, *The Law of Civil Commitment in Pennsylvania: Towards a Consistent Interpretation of the Mental Health Procedures Act*, 38 Duq. L. Rev. 1, 5 (1999).

followed this paradigm, deferring to the medical profession and the judgment of physicians, and premising commitment upon the individual need for treatment.[8]  In 1966, the General Assembly replaced the Mental Health Act with the Mental Health and Intellectual Disability Act ("MHIDA").[9]

Shortly thereafter, California modernized its mental health law by enacting the Lanterman-Petris-Short Act, which explicitly stated that one of its purposes was "[t]o provide services in the least restrictive setting appropriate to the needs of each person receiving services under this [Act]."[10]  This legislation spurred a nationwide reorientation, with civil commitment based principally upon the criterion of dangerousness coupled with the need for treatment.[11]

As the MHIDA's failure to protect the rights of the mentally ill became evident,[12] societal trends continued to move away from commitment and toward community-based treatment that prioritizes patient autonomy and liberty.  Social support for the rights of

---

[8]     50 P.S. §§ 1071-1622 (repealed 1966).

[9]     50 P.S. §§ 4101-4704 (repealed in part 1976).

[10]     Cal. Welf. & Inst. Code § 5001(i) (1967).

[11]     Bruce A. Arrigo, *Paternalism, Civil Commitment and Illness Politics: Assessing the Current Debate and Outlining a Future Direction*, 7 J. L. & HEALTH 131, 140 (1992/93); *see also Humphrey v. Cady*, 405 U.S. 504, 509 (1972) (concluding that involuntary commitment could not be justified "solely on the medical judgment that the defendant is mentally ill and treatable [without also showing ] the social and legal judgment that his potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty"); *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) (holding that mentally ill and dangerous is the constitutionally acceptable standard for involuntary commitment).

[12]     *See, e.g., Bartley v. Kremens*, 402 F.Supp. 1039 (E.D. Pa. 1975) (holding that voluntary commitment of minors by parents denies due process); *Dixon v. Attorney General*, 325 F.Supp. 966 (M.D. Pa. 1971) (holding that commitment upon the certification of two physicians denies due process); *Commonwealth v. McBurse*, 348 A.2d 423 (Pa. 1975) (recognizing that indefinite commitment denies due process).

mental health patients was premised upon two demands: "first, that once patients are admitted they be given adequate treatment designed to alleviate or cure their illness; and second, that commitment procedures incorporate due process guarantees similar to those found in the criminal justice system."[13] In 1976, Pennsylvania's General Assembly responded by enacting the MHPA.

The MHPA is intended "to assure the availability of adequate treatment to persons who are mentally ill" through "procedures whereby this policy can be effected" employing "the least restrictions consistent with adequate treatment."[14] This policy favors avoidance of inpatient treatment in circumstances where community-oriented or outpatient care is possible. The MHPA affords mental health patients the greatest opportunity to manage their own care while continuing to participate in society, instead of removing these patients from society, whether involuntarily or voluntarily.

To implement the right to adequate treatment, and to afford due process, the MHPA established new procedures for the admission and treatment of the mentally ill. In particular, the MHPA governs the rights and procedures pertaining only to voluntary

---

[13]   Paul A. Lundeen, *Pennsylvania's New Mental Health Procedures Act: Due Process and the Right to Treatment for the Mentally Ill*, 81 DICK. L. REV. 627, 628 (1977).

[14]   50 P.S. § 7102; *see also id*. § 7107(a) (requiring individualized treatment plans that "impose the least restrictive alternative consistent with affording the person adequate treatment for his condition"); *Leight*, 243 A.3d at 130 (recognizing that "in all instances, the least restrictive approach consistent with adequate treatment should be utilized").

inpatient treatment and involuntary treatment.[15] It does not apply to voluntary outpatient treatment.[16]

Section 114 of the Act affords limited civil and criminal immunity for examination and treatment decisions under the Act as follows:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.[17]

Not only does Section 114 provide limited immunity; it also affirmatively creates a duty that requires mental health professionals and institutions to avoid willful misconduct and gross negligence in the treatment of mental health patients under the Act, and it imposes liability for a breach of that duty.[18] The cause of action created in Section 114

---

[15] 50 P.S. § 7103 ("This act establishes rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons."); *Leight*, 243 A.3d at 130 (recognizing that "the scope of the MHPA is limited, as it establishes rights and procedures only for the involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for the voluntary inpatient treatment of mentally ill persons").

[16] *See Leight*, 243 A.3d at 130 ("[T]he voluntary treatment of outpatients falls outside the scope of the MHPA.").

[17] 50 P.S. § 7114.

[18] *See Goryeb v. Commonwealth, Dep't of Pub. Welfare*, 575 A.2d 545, 548-49 (Pa. 1990) (holding that a party participating in a decision to examine, treat, or discharge a mentally ill patient under the MHPA who commits willful misconduct or gross negligence can be liable for such decision or for any of its consequences); *see also Sherk v. County of Dauphin*, 614 A.2d 226, 232 (Pa. 1992) (plurality) (same).

applies only to willful misconduct or gross negligence that occurs in certain circumstances. In the case of "a county administrator, a director of a facility, a physician, a peace officer or any other authorized person," liability is implicated only by participation in (1) a decision that a person be examined or treated under the Act; (2) a decision that a person be discharged; (3) a decision that a person be placed under partial hospitalization, outpatient care, or leave of absence, or (4) a decision that the person's restraint be otherwise reduced.[19] In the case of a county administrator or "other authorized person," the cause of action created in Section 114 also applies to the denial of an application for voluntary inpatient treatment or involuntary emergency examination and treatment.[20] If there is no participation in such a decision or in the denial of the application, there can be no cause of action under Section 114. Frederick's estate would premise liability here upon the first type of conduct: participation in a decision that Wise be examined or treated under the MHPA.[21]

Liability under Section 114 is implicated only if Wise became a voluntary inpatient, and if Geisinger and Alley participated in a decision that Wise be examined or treated as such. The question of when a person ceases to be a voluntary outpatient (whose care falls outside of the Act) and becomes instead a voluntary inpatient is a question that is

---

[19]    50 P.S. § 7114.

[20]    *Id*.

[21]    Maj. Op. at 31-32; *Matos v. Geisinger Med. Ctr.,* 291 A.3d 899, 910 (Pa. Super. 2023). No liability is claimed here arising from denial of an application for voluntary treatment. The Superior Court observed that such liability is not implicated because Wise did not make an application to a county administrator or other authorized person, and instead presented himself directly to Geisinger and Alley for voluntary inpatient treatment. *Matos,* 291 A.3d at 909 n.5. Frederick's estate offers no argument against this conclusion.

answered by the Act itself. Favoring voluntary outpatient care over voluntary inpatient care, the Act specifies the processes and standards that govern the transition from voluntary outpatient to voluntary inpatient (Article II) or involuntary (Article III) status. None of the processes to obtain admission as a voluntary inpatient is alleged to have occurred in this case.[22]

In particular, the Act defines "inpatient treatment,"[23] defines who may apply for voluntary inpatient examination and treatment,[24] defines the process for requesting such care,[25] requires the application to be in writing,[26] establishes certain prerequisites to acceptance of the application,[27] and provides a process for notice, examination, and treatment following acceptance.[28]

"Inpatient treatment" is "[a]ll treatment that requires full or part-time residence in a facility."[29] Because Wise was not being treated while in residence in a facility, Wise's

---

[22] The Majority imagines that liability under Section 114 can attach (if there is willful misconduct or gross negligence) when a person requests inpatient treatment. Maj. Op. at 31. Under Section 114, however, it is the participation in examination and treatment decisions "under the Act" that triggers liability. 50 P.S. § 7114. The Act, and the liability contained in Section 114, pertains to voluntary inpatients, not to voluntary outpatients. *Id.* § 7103. The process by which a person becomes a voluntary inpatient is established by the Act. *Id.* §§ 7102, 7103.

[23] 50 P.S. § 7103.1.

[24] *Id.* § 7201.

[25] *Id.* § 7202.

[26] *Id.* § 7110.

[27] *Id.* § 7203.

[28] *Id.* §§ 7204, 7205.

[29] *Id.* § 7103.1. "Facility" is further defined as a place "that provides for the diagnosis, treatment, care or rehabilitation of mentally ill persons, whether as outpatients or inpatients." *Id.*

transient emergency room visits fall short of attaining the residency required for "inpatient treatment" under Section 103.1 of the Act. Wise remained a voluntary outpatient to whom the Act is inapplicable.[30] The Majority's decision to construe "inpatient treatment" as including a person's request for inpatient treatment for mental illness is a decision that ignores the residential component of the definition.[31]

Section 201 of the Act describes who may apply for voluntary inpatient examination and treatment:

> Any person 14 years of age or over who believes that he is in need of treatment and substantially understands the nature of voluntary treatment may submit himself to examination and treatment under this act, provided that the decision to do so is made voluntarily. A parent, guardian, or person standing in loco parentis to a child less than 14 years of age may subject such child to examination and treatment under this act, and in so doing shall be deemed to be acting for the child. Except as otherwise authorized in this act, all of the provisions of this act governing examination and treatment shall apply.[32]

According to the Majority, Section 201 provides that the sole prerequisite to voluntary inpatient admission is a person's appearance at facility requesting inpatient examination and treatment.[33] The Majority holds that Section 201 does not require a written application.[34] On this basis, the Majority accepts the estate's argument that

---

[30] *Id*. § 7103 (defining the scope of the Act); *see also Chartiers Cmty. Mental Health & Retardation Ctr., Inc. v. Dep't of Pub. Welfare*, 696 A.2d 244, 247 (Pa. Cmwlth. 1997) ("[U]nder Section 7103 of the [MHPA], 50 P.S. §§ 7103, and Section [ ] 4102 of the [MHIDA], 50 P.S. § 4102, partial hospitalization is not a form of inpatient treatment because it does not require 'residence.'").

[31] Maj. Op. at 30.

[32] 50 P.S. § 7201.

[33] Maj. Op. at 32-33.

[34] *Id*. at 33.

Geisinger and Alley participated in a decision that Wise be examined or treated as a voluntary inpatient.

Section 201 does not define how or when voluntary inpatient examination or treatment begins. Section 201 is significant not because it describes how a person becomes a voluntary inpatient, but because it describes who may apply to be accepted for this type of care, either on their own behalf or on behalf of a child. Anyone over the age of fourteen may submit himself or herself to examination and treatment under the Act if the person believes himself or herself to be in need of treatment and substantially understands the nature of voluntary treatment.[35] For children under the age of fourteen, the child's parent, guardian, or a person standing *in loco parentis* may subject the child to examination and treatment.[36] In this respect, Section 201 made "a significant step toward increasing the availability of mental health care for persons fourteen to eighteen years old by providing that they may apply for examination and treatment without prior parental consent."[37]

Section 202 describes the process for requesting voluntary inpatient treatment:

> Application for voluntary examination and treatment shall be made to an approved facility or to the county administrator, Veterans Administration or other agency of the United States operating a facility for the care and treatment of mental illness. When application is made to the county administrator, he shall designate the approved facility for examination and for such treatment as may be appropriate.[38]

---

[35] 50 P.S. § 7201.

[36] *Id.*

[37] Lundeen, *Pennsylvania's New Mental Health Procedures Act*, 81 DICK. L. REV. at 635; *compare* 50 P.S. § 7201 *with* 50 P.S. §§ 4402(a), 4403(a).

[38] 50 P.S. § 7202.

If a person described in Section 201 qualifies for voluntary inpatient treatment, then, under Section 202, he or she makes an application for admission either directly to the facility, or to the county administrator. Whenever the application is made to the county administrator, the administrator designates a facility to perform the examination and treatment. By the plain terms of Section 202, an application is made before examination and treatment commence.

Unless the patient's care is entirely privately funded, Section 110(a) requires all commitment-related paperwork, including applications made under Section 202, (1) to be in writing, (2) to be verified upon pain of criminal sanction, and (3) to include notice to that effect. In particular, "all applications" made under the Act are "subject to the penalties provided under 18 Pa.C.S. § 4904" and "shall contain a notice to that effect."[39] Section 4904 of the Crimes Code pertains to writings, such that a misdemeanor of the second degree occurs if a person "with intent to mislead a public servant in performing his official function," "makes any written false statement which he does not believe to be true," and such that a misdemeanor of the third degree occurs if a person "makes a written false statement which he does not believe to be true, on or pursuant to a form bearing notice, authorized by law, to the effect that false statements made therein are punishable."[40]

The general requirement in Section 110(a) that an application be in writing, and the requirement in Section 202 that there be an application for voluntary examination and treatment, plainly mandate a written application as a prerequisite to acceptance as a voluntary inpatient under the Act. Without a written application, there is no compliance

---

[39] *Id.* § 7110(a).

[40] 18 Pa.C.S. § 4904(a), (b).

with Section 110(a). Further, if public funding is involved, Section 110(b) requires all applications to "be submitted to the county administrator," something that cannot be done if the application is not in writing.[41] In the absence of private funding, Section 110 plainly requires a written application for voluntary inpatient care.[42]

"Before a person is accepted for voluntary inpatient treatment," Section 203 prescribes three prerequisites. First, Section 203 requires "an explanation" of "such treatment, including the types of treatment in which [the person] may be involved, and any restraints or restrictions to which [the person] may be subject."[43] Second, Section 203 requires the provision of "a statement of [the patient's] rights under this act."[44] Third, Section 203 requires the patient's consent once the explanation and the statement are provided, as follows:

> Consent shall be given in writing upon a form adopted by the department. The consent shall include the following representations: That the person understands his treatment will involve inpatient status; that he is willing to be admitted to a designated facility for the purpose of such examination and treatment; and that he consents to such admission voluntarily, without coercion or duress; and, if applicable, that he has voluntarily agreed to

---

[41] 50 P.S. § 7110(b).

[42] The Majority tells us that Section 110's requirement that applications be in writing applies only when the Act otherwise requires the application to be in writing. Maj. Op. at 36, n.31. Because Section 202 does not itself require the application to be written, the Majority asserts, Section 110 is not implicated. *Id*.

Not so. The plain language of Section 202 requires an "application" for voluntary inpatient treatment. 50 P.S. § 7202. Section 110(a) subjects all "applications" "required under the provisions of this act" to the criminal penalties relating to unsworn falsification and mandates "notice to that effect." *Id*. § 7110(a). In order to comply with Section 110, the application required in Section 202 must be in writing. This requirement is not, as the Majority asserts, "extra-statutory." Maj. Op. at 37. It is statutory. The legislative intent is established by the plain statutory language.

[43] 50 P.S. § 7203.

[44] *Id*.

remain in treatment for a specified period of no longer than 72 hours after having given written notice of his intent to withdraw from treatment. The consent shall be part of the person's record.[45]

There is no acceptance into voluntary inpatient treatment without the explanation, statement of rights, or written consent. And without acceptance, the person remains a voluntary outpatient whose care falls outside the scope of the Act.

Sections 204 and 205 describe the post-acceptance process for examination and treatment. Under Section 204, "[u]pon acceptance of an application for examination and treatment by a minor 14 years or over but less than 18 years of age," the director of the facility is required promptly to notify the minor's parents or guardians of the acceptance and of their right to object and to be heard.[46] The parents or guardians may object and be heard on the objection within seventy-two hours.[47]

Under Section 205, "upon acceptance of a person for voluntary examination and treatment," the patient "shall be given a physical examination."[48] "Within 72 hours after acceptance of a person," a treatment team will formulate "an individualized treatment plan."[49] The treatment plan "shall state whether inpatient treatment is considered necessary," as well as "what restraints or restrictions, if any, will be administered."[50] The patient has a right to be advised of the treatment plan.[51] The concept of a treatment plan

---

[45]     *Id*.

[46]     *Id*. § 7204.

[47]     *Id.*

[48]     *Id*. § 7205.

[49]     *Id.*

[50]     *Id.*

[51]     *Id.*

and the repeated references to being "accepted" for "treatment"[52] were new to Pennsylvania with the advent of the MHPA, and are indicative of the legislative focus upon treatment rather than custodial confinement.[53]

With these provisions—Sections 201-205 and 110—the MHPA establishes the broad outlines of the process for voluntary inpatient admission. In Section 112, the General Assembly tasked the Department of Public Welfare (the "Department") to create "rules, regulations and forms" to effectuate the Act.[54] The Department has done so, providing a regulatory scheme and related forms that guide the admission process.[55]

Regulation 5100.72(a) requires that applications for voluntary inpatient admission be made in writing "upon Form MH-781, issued by the Department."[56] Regulation

---

[52]   *Id*. §§ 7203, 7302, 7301.

[53]   Lundeen, *Pennsylvania's New Mental Health Procedures Act,* 81 DICK. L. REV. at 629 ("The word 'treatment' is used repetitively throughout the Act. This is in stark contrast to the use of the word 'commitment'" in the Act's predecessor).

[54]   50 P.S. § 7112 ("The department shall adopt such rules, regulations and forms as may be required to effectuate the provisions of this act.").

[55]   55 Pa. Code. §§ 5100.1-5100.93.

[56]   *Id.* § 5100.72(a) ("Written application for voluntary inpatient treatment shall be made upon Form MH-781, issued by the Department."). The Majority claims that this regulatory requirement applies only when there is a written application, and does not require all applications to be in writing. Maj. Op. at 37. This is error. Section 112 tasked the Department with creating forms to effectuate the Act. 50 P.S. § 7112. The Department responded by requiring "written application for voluntary inpatient treatment" upon Form MH-781. 55 Pa. Code § 5100.72(a). The use of this form "is mandated," and "no substitute form is permitted" without prior written authorization. *Id*. at § 5100.23(b).

The Majority asserts that, if Regulation 5100.72(a) requires an application to be in writing, this would conflict with Sections 201 and 202 of the Act. Maj. Op. at 38. Here, too, the Majority errs, as the regulation is entirely consistent with the plain text of Sections 201, describing who may apply, 202, requiring an application to be made, and 110(a), requiring the application to be in writing. 50 P.S. §§ 7201, 7202, 7110(a).

5100.72(b) imposes conditions upon a state-operated facility's ability to "accept an application for voluntary inpatient treatment for persons not currently in the facility."[57] Without satisfaction of these conditions, a facility "shall not accept an application for voluntary inpatient treatment."[58]

Regulation 5100.72(c) and (d) direct the post-application process. When the application is made directly to the facility, the director of the facility ensures that "a preliminary evaluation of the applicant is conducted in order to establish the necessity and appropriateness of outpatient services or partial hospitalization or inpatient hospitalization service for the individual applicant."[59] The written application and the preliminary evaluation are required "in order" for the providers to determine whether to accept the application.[60] When the application is made to the administrator, the administrator designates a facility to conduct the "preliminary evaluation."[61] The facility then notifies the administrator of its findings, prompting the administrator to designate a

---

[57]     55 Pa. Code § 5100.72(b).  Regulation 5100.72(b) provides that "[a] State-operated facility shall not accept an application for voluntary inpatient treatment for persons not currently in the facility" without first meeting certain regulatory requirements. These requirements include concurrence on an individual case basis given by the administrator, id. § 5100.72(b)(1), and an approved "preexisting agreement of waiver" or an approved "preexisting letter of agreement" between the facility and the administrator defining the security and responsibilities of both parties, *id.* § 5100.72(b)(2)-(4).

[58]     *Id.* § 5100.72(b).

[59]     *Id.* § 5100.72(c)(1).

[60]     *Id.*

[61]     *Id.* § 5100.72(d)(1).

facility for treatment.[62]   The results of the preliminary evaluation are "set forth on Form MH-781-A issued by the Department."[63]

The "preliminary evaluation" referenced in Regulation 5100.72(c) and (d) is the assessment tool that the facility uses to aid its decision to accept an application for voluntary inpatient care.  Regulation 5100.2 defines this term as follows:

> The initial assessment or evaluation of the physical and mental condition of an individual; it may be conducted without substantiation by formal testing procedures. The evaluation includes an assessment of the person's specific physical, psychological, developmental, familial, educational or vocational, social, and environmental needs in order to determine the adequacy, of the person's logic, judgment, insight, and self control to responsibly meet his needs.[64]

There are legislatively prescribed standards that inform the facility's decision to accept or reject an application, including whether inpatient care is appropriate given the policy mandate in favor of care provided in the least restrictive setting.[65]  Indeed, the "preliminary evaluation" itself is required to "be done in the least restrictive setting possible."[66]

The facility's decision to accept or reject an application for voluntary inpatient admission is also informed by whether the facility is equipped to provide the level of treatment mandated by Section 104 of the Act, including accommodations that are available to voluntary inpatients as well as opportunities for recreation, education, and

---

[62]     *Id.* § 5100.72(d).

[63]     *Id.* § 5100.72(c)(1).

[64]     *Id.* § 5100.2.

[65]     50 P.S. § 7102.

[66]     55 Pa. Code § 5100.72(c)(1).

medical care.[67]  Whether a patient requires inpatient care, including on a voluntary basis, is a medical decision premised upon the judgment of healthcare providers, not upon the patient's beliefs or desires.  If voluntary inpatient care is not warranted, the facility may decline to accept the application.

Regulation 5100.23(a) implements the requirement of Section 110 that applications be in writing; it does so by requiring applications to be on forms issued by the Department.[68]  "No substitute for such forms is permitted without prior written authorization of the Deputy Secretary of Mental Health."[69]  Regulation 5100.71 implements Sections 201 and 203 by requiring a person seeking voluntary inpatient admission to "substantially understand the nature of such treatment and the treatment setting," and provides that the "test" of this substantial understanding is the person's "consent to the information and explanations outlined" in Section 203 of the Act.[70] Regulation 5100.73 implements the explanation, statement of rights, and consent requirements of Section 203, and designates Form MH-781 to reflect the satisfaction of these requirements.[71]

---

[67]     50 P.S. § 7104 ("Adequate inpatient treatment shall include such accommodations, diet, heat, light, sanitary facilities, clothing, recreation, education and medical care as are necessary to maintain decent, safe and healthful living conditions."); *id*. ("Treatment shall include diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness and shall also include care and other services that supplement treatment and aid or promote such recovery.").

[68]     55 Pa. Code 5100.23(a).

[69]     *Id.* § 5100.23(b).

[70]     *Id*. § 5100.71(a), (b).

[71]     *Id.* § 5100.73.

The Department's form MH-781 thereby implements several provisions of the Act. It effectuates Section 202's requirement for an application,[72] Section 110's requirement that the application be in writing,[73] Section 201's requirement of a substantial understanding of voluntary inpatient treatment,[74] and the consent requirement of Section 203.[75] The form itself also implements the explanation and statement of rights requirements of Section 203. Further, to comply with the notice of criminal sanctions required by Section 110(a), Form MH-781 provides that "any person who knowingly provides any false information when he/she completes this form may be subject to prosecution."[76] Form MH-781 also requires acknowledgment of the mandate in Section 206 that a voluntary patient must provide written notice of his or her withdrawal from treatment subject to a delay of no more than seventy-two hours,[77] and confirms that the patient has received notice of the results of the preliminary evaluation as required by Regulation 5100.72(c)(1) and (d). Form MH-781 is wholly consistent with the Act. Frederick's estate does not argue otherwise, and does not challenge any regulation before this Court.

---

[72]    *Id.* § 5100.72(a).

[73]    *Id*.

[74]    *Id*. § 5100.71(a).

[75]    *Id*.

[76]    *See* Maj. Op. at 41-42 (reproducing Form MH-781).

[77]    *See* 50 P.S. § 7206(a) ("A person in voluntary inpatient treatment may withdraw at any time by giving written notice unless, as stated in section 203 he has agreed in writing at the time of his admission that his release can be delayed following such notice for a period to be specified in the agreement, provided that such period shall not exceed 72 hours.").

The MHPA and the Regulations promulgated under it provide a comprehensive process governing transition from voluntary outpatient to voluntary inpatient.[78] A qualified person under Section 201 makes an application to an entity defined in Section 202 in writing under Section 110 and Regulation 5100.72(a). Before acceptance for voluntary inpatient treatment, the person receives an explanation and a statement of rights, and provides written consent under Section 203 and Regulation 5100.73.[79] Also prior to acceptance, if the facility is state-operated, it must satisfy Regulation 5100.72(b); otherwise it is bound not to accept the application for treatment. After the application is made, the approved facility either conducts the preliminary evaluation under Regulation 5100.72(c) or the county administrator designates a facility to conduct the preliminary evaluation under Regulation 5100.72(d). The facility exercises medical judgment to assess "the necessity and appropriateness of" inpatient services for the person consistent with the policy objectives articulated in Section 102.[80]

Once these prerequisites are completed, then, and only then, does the facility have the discretion to accept the application for voluntary inpatient admission. Under the facts of today's case, this process did not occur. Wise was never accepted for inpatient care. Wise was evaluated and treated in the emergency department. He was determined not to warrant inpatient admission. Wise remained, at all relevant times, a voluntary

---

[78] The Majority faults me for "interweave[ing] statutory citations and regulatory citations, as if they are of equivalent authoritative weight." Maj. Op. at 38, n.34. This is a straw man. A regulation that conflicts with a statute must yield to the statute. No one would suggest otherwise. In this case, however, the regulations effectuate the provisions of the Act. Frederick's estate does not dispute this.

[79] 50 P.S. § 7203; 55 Pa. Code § 5100.73.

[80] 55 Pa. Code § 5100.72(c)(1), (d)(1).

outpatient to whom the Act is inapplicable, including for purposes of the limited cause of action created in Section 114.  Frederick's estate has not alleged that that Geisinger or Alley were negligent in their examinations and treatments of Wise as an involuntary patient or as a voluntary inpatient.  Rather, the estate seeks to expand the cause of action created by Section 114 beyond the scope of the Act so as to also encompass care provided to a voluntary outpatient.  The plain language of the Act does not support this construction.

Our decision in *Leight* supports application of the plain language of Article II of the MHPA.  In *Leight*, this Court recognized the limited scope of the MHPA and held that the defendants in that case were "not liable under the MHPA for considering, but not formalizing the prerequisites for, an involuntary emergency examination."[81]  *Leight* resolved the question of how a voluntary outpatient becomes an involuntary patient whose care is subject to the Act.  The appellants in *Leight* argued that certain physicians knew or should have known that their patient, John F. Shick, was severely mentally ill and in need of involuntary treatment, but that those physicians failed to take the steps necessary to have Shick involuntarily examined and treated.  The cause of action was predicated upon the alleged failure of the physicians to begin the commitment process by submitting a written application for immediate involuntary examination under Section 302, which contains three alternative prerequisites to involuntary emergency examination.[82]  The appellants argued that the physicians' failure to do so reflected their participation "in

---

[81]    *Leight*, 243 A.3d at 130.

[82]    *See* 50 P.S. § 7302.

a decision that a person be examined or treated" under the Act in accord with Section 114.[83]

This Court held that "participat[ing] in a decision that a person be examined" under Section 114 is achieved "*only* after one of the prerequisites set forth in Section 302 for an involuntary emergency examination is satisfied."[84]  "It is only when a physician files the required documentation for involuntary emergency examination that he becomes a participant in the decision-making process under the Act."[85]  This was consistent with Section 114's grant of immunity to those "who den[y] an application for voluntary treatment or for involuntary emergency examination and treatment"[86] because, before an application can be denied, it must be "first formally made."[87]  Actions that fall short of satisfying the requirements of Section 302 "do not transform voluntary outpatient treatment into involuntary treatment."[88]

As support, this Court cited the Superior Court decision in *Fogg v. Paoli Memorial Hospital*.[89]  In that case, Edward Fogg presented himself to the emergency room of a hospital at the direction of his treating psychiatrist, who had arranged for Fogg's voluntary admission into the hospital's psychiatric ward.  Although aware of Fogg's highly agitated

---

[83]     *Leight*, 243 A.3d at 140.

[84]     *Id*. at 141 (emphasis in original).

[85]     *Id*.

[86]     *Id.* (citing 50 P.S. § 7114).

[87]     *Id.*

[88]     *Id.*

[89]     686 A.2d 1355 (Pa. Super. 1996).

state, emergency room personnel increased Fogg's agitation by making him wait in the emergency room and ultimately redirecting him to a different location in the hospital. During his walk through the hospital, Fogg threw himself out a window to his death.

In the subsequent negligence action, the hospital claimed immunity under Section 114 of the MHPA. The Superior Court held that immunity was not available because Fogg had not been treated under the Act. "Since no one from [the hospital] who was trained in the field of mental health was treating [Fogg] or making decisions regarding his treatment at the time of the accident, [the hospital] cannot avail itself of the immunity protections of the MHPA."[90] This Court's citation to *Fogg* in *Leight* manifested our recognition that simply presenting oneself at an emergency room does not establish treatment under the Act.[91]

We also recognized that merely thinking, considering, or "the taking of some preliminary action shy of the formal statutory steps" is not participating in an examination or treatment decision under the Act, inasmuch as physicians are entitled to certainty concerning the point at which their conduct may subject them to liability under Section

---

[90]     *Id.* at 1358.

[91]     The Majority labors to distinguish *Fogg* from this case on the basis that Wise, purportedly unlike Fogg, "affirmatively and repeatedly" requested admission. Maj. Op. at 34, n.30. This vanishingly thin reed offers a distinction without a difference. In *Fogg*, the decedent's psychiatrist had arranged admission into the psychiatric wing of Paoli Memorial Hospital. The psychiatrist informed the hospital that Fogg was in a highly agitated state, was experiencing intense anxiety, depression, homicidal ideation, and visual/audio hallucinations. *Fogg*, 686 A.2d at 1356. When Fogg and his family arrived in the emergency room, Fogg's mother informed the registrar that her son was hallucinating and had been assigned a reserved bed in the psychiatric wing. As Fogg became increasingly agitated, pacing the room, Fogg's parents repeatedly requested that someone examine or treat their son. In this respect, the facts of *Fogg* resemble the events of this case.

114.[92]  Broadly interpreting the cause of action created by Section 114 would expand liability "not only for those trained as mental health professionals, but also for those . . . who are untrained 'in rendering treatment in [the] unscientific and inexact [mental health] field.'"[93]  Had we held otherwise in *Leight*, "countless resources would be expended in litigating whether various preliminary or partly formed thoughts, states of mind, back-and-forths, and mullings-over were encompassed within the MHPA, and health care providers would labor in uncertainty as to whether their actions exposed them to statutory liability."[94]

Finally, we observed that broadly reading the MHPA to allow civil liability for informal considerations would encourage the over-commitment of patients in order to hedge against potential liability, an incentive that is inconsistent with the goal of treating patients within the least restrictions alternative.[95]  Our interpretation of the Act in *Leight* "limits liability to discrete and clear actions on the part of health care workers, creates a bright line consistent with the plain language of the MHPA, and serves both the physician and the mental health patient."[96]

The Majority disregards *Leight* upon the rationale that *Leight* concerned the process of involuntary admission under Article III, rather than the process of voluntary inpatient admission under Article II.  But Articles II and III contain parallel provisions that assist in understanding the substance and process of the entire statutory scheme.  For

---

[92]   *Leight*, 243 A.3d at 141.

[93]   *Id.* at 141-42 (citing *Farago v. Sacred Heart Gen. Hosp.* 562 A.2d 300, 304 (Pa. 1989)).

[94]   *Id.* at 145 (Wecht, J., concurring).

[95]   *Id.* at 142.

[96]   *Id.* at 142.

example, whereas Section 201 describes who may obtain voluntary inpatient treatment, Section 301 describes who may obtain involuntary treatment.[97]  Just as Section 201 says nothing of the process to obtain voluntary inpatient status, Section 301 does not govern "the decision to undertake an emergency involuntary examination of an individual for involuntary commitment."[98]  It is, rather, Section 302 that governs the process for subjecting a severely mentally ill person to involuntary emergency examination, just as it is Section 202 that governs the process for voluntary admission.[99]   Because Wise did not apply for admission in writing as required by Sections 202 and 110, he remained a voluntary outpatient, outside of the scope of the Act.

The Majority's failure to abide by the plain language of Article II in the same manner employed in *Leight* as to Article III will lead to precisely the uncertainty that we were careful to guard against in that case.  This uncertainty will create confusion among providers concerning the point at which their decisions fall within the scope of the duty created by the MHPA.  In *Leight*, the Court recognized the importance of upholding the Act's bright-line rule and of avoiding uncertainty with respect to when early-stage decisions fall within the duty created by the MHPA.  We were rightly concerned about the

---

[97]   *See* 50 P.S. § 7301 ("Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment."); *Leight*, 243 A.3d at 140, n.4 ("Section 301 provides that when a person is severely mentally disabled and in need of immediate treatment, he may be subjected to an involuntary emergency examination.").

[98]   *Leight*, 243 A.3d at 140 ("[T]he decision to undertake an emergency involuntary examination of an individual for involuntary commitment is governed by Section 302 of the MHPA. 50 P.S. § 7302.").

[99]   50 P.S. § 7302; *Leight*, 243 A.3d at 140; *see also Leight,* 243 A3d at 144 (Wecht, J., concurring) ("Only those physicians who invoke Section 302 are deemed to participate in a decision that a person be examined under the MHPA.").

uncertainty that the appellants' contrary interpretation would create, recognizing that it "would create a statutory gray area in which physicians would have to speculate as to the point at which their conduct might be subject to liability under the MHPA."[100]  This problem afflicts the Majority's interpretation of the MHPA today.  Under this interpretation, there are no formal mechanisms for becoming a voluntary inpatient whose care is subject to the cause of action created in Section 114.

This uncertainty places providers in a difficult position.  In contrast to the certainty established for involuntary patients that we recognized in *Leight*, and the certainty provided by the Act's written application process for voluntary patients, the Majority's reasoning requires providers to determine whether any communication by a mental health patient is a request for voluntary inpatient admission.  The Majority itself uses language suggestive of this uncertainty, characterizing conduct that may lead to liability as failing "to admit,"[101] failing to "engage in the evaluation and treatment processes mandated by the MHPA,"[102] failing to provide inpatient treatment,[103] releasing Wise without conducting "a more thorough examination,"[104] and failing to assist in having Wise admitted at a separate facility.[105]  The Majority explains the trial court's understanding of liability as

---

[100]  *Leight*, 243 A.3d at 141.

[101]  Maj. Op. at 2.

[102]  *Id.* at 2.

[103]  *Id.* at 18.

[104]  *Id.* at 22.

[105]  *Id.* at 32.

encompassing the failure to commit,[106] the release of Wise with no treatment,[107] the failure to effectuate a voluntary inpatient admission,[108] the negligent discharge of Wise,[109] and the refusal to accept a "volatile and desperate" individual.[110]

Most of these characterizations demonstrate that Wise never became an inpatient but remained instead a voluntary outpatient. For example, the trial court's conclusion that Wise should have been admitted or should not have been released without treatment recognizes that he was not, in fact, admitted or treated under the Act. Since he was never accepted as a voluntary inpatient, the Act did not apply.

To the extent that the Majority perceives the potential for liability as stemming from the failure to "engage in the evaluation and treatment processes mandated by the MHPA,"[111] its characterization calls into question what processes the Act mandates. Without following the statutory process, a patient remains a voluntary outpatient to whom there is no obligation to provide evaluation or treatment under the Act. Similarly, the Majority's conclusion that one attains voluntary inpatient status simply by asking for an evaluation and diagnosis puts the rabbit in the hat. A person asking for voluntary inpatient status, or the evaluation and diagnosis that are attendant to that status, is not yet a

---

[106]  *Id.* at 9.

[107]  *Id.*

[108]  *Id.* at 15.

[109]  *Id.*

[110]  *Id.*

[111]  *Id.* at 2.

voluntary inpatient. For a person to become a voluntary inpatient, the Act requires all of the processes detailed above, including an application, consent, and acceptance.[112]

The Majority's extension of liability from the formal, statutory process of the MHPA to informal, unwritten requests will lead to unnecessary litigation that strives to resolve the point at which certain conduct falls within the MHPA's scope. What, precisely, constitutes "submitting oneself" to examination and treatment? Who is included in the variety of individuals to whom this submission is made? The Majority's decision today could turn any mental healthcare appointment into a potential source of liability under the MHPA.[113]

---

[112] Section 114 imposes liability upon "a county administrator or other authorized person" for the denial of "an application for voluntary treatment"—a circumstance that is not implicated in this case. Under Section 202, when the application is made to the county administrator, the administrator will designate an approved facility. Contrary to the Majority's assertion, Maj. Op. at 31, n.28, I offer no opinion of the process by which an administrator or other authorized person denies an application, a circumstance beyond the issues involved in this appeal.

To the extent that the Majority suggests that my interpretation of the Act would insulate from liability a facility's rejection of an application for voluntary inpatient examination and treatment, Maj. Op. at 31, n.28, I can only say that my interpretation is grounded in the plain language of the Act, and the Majority should address its complaints to the legislature. As written, the Act permits medical professionals the opportunity to consider an application for inpatient admission and to use their medical judgments to determine whether admission is appropriate. This decision is guided by the Act's preference for care provided in the least restrictive setting, 50 P.S. § 7102, and by the determination of whether the facility is able to deliver the level of treatment required by Section 104. A decision to reject an application and to deny inpatient admission would be governed not by Section 114, but by ordinary principles of negligence.

[113] The Majority is not concerned about the unnecessary litigation that its opinion will engender. Maj. Op. at 40, n.35. The Majority deems my concern to be unwarranted because the liability imposed by Section 114 is not boundless, as it must be the result of willful misconduct or gross negligence. *Id*. The Majority is correct that this is the standard that Section 114 imposes. This heightened standard for liability was likewise applicable to the involuntary examination and treatment process we examined in *Leight*. Yet we still recognized therein that providers were entitled to the formal, statutory process for (continued…)

In addition to being contrary to the plain language of the MHPA and to the need to avoid uncertainty that animated *Leight*, the Majority's decision, will encourage the provision of care in more restrictive settings, thwarting the purpose of the MHPA. Subjecting providers to the uncertainty of liability in the process of converting a patient from voluntary outpatient to voluntary inpatient status will necessarily incentivize providers to take an approach that shields them from liability. In many circumstances, this approach will be to commit a patient for inpatient treatment even when it is not clinically necessary to do so. Incentivizing the practice of defensive medicine—the provision of non-medically necessary care or care provided in more restrictive settings in order to avoid litigation—is contrary to the stated purpose of the MHPA to provide care in the lease restrictive setting.[114] The MHPA represents the legislature's policy judgment that individuals with mental illness have a right to mental healthcare and to liberty.[115] We should not be so eager to construe legislation intended to promote deinstitutionalization as promoting instead the provision of mental healthcare in more restrictive settings.

The purposes of the MHPA are described in Section 102 as the provision of adequate treatment to the mentally ill consistent with due process and in the least

---

admission that the General Assembly chose to create. The same is true for the voluntary admission process established in Article II. Under today's decision, the absence of a formal, statutory process in the case of voluntary inpatient admission will lead to exactly the kind of unnecessary litigation that the General Assembly sought to avoid in Article III, as enforced in *Leight*, as well as in Article II, as disregarded by today's Majority.

[114]     50 P.S. § 7102.

[115]     *Leight*, 243 A.3d at 145 (Wecht, J., concurring) ("The MHPA was enacted in 1976 to move away from the indeterminate, involuntary hospitalization of the mentally ill to a community-based treatment model that vested the mentally ill with the right to reject psychiatric treatment as long as they were not a danger to themselves or others.").

restrictive setting. The legislative concern for the due process rights of the mentally ill that drove the reforms that culminated in the MHPA is effectuated through the formal application process for voluntary admission, a process that was designed to conform to "the principles of due process to make voluntary and involuntary treatment available."[116]

Without a bright-line rule, "uncertainty and speculation" will engulf "a statutory framework designed to be clear and precise in its protections of the due process rights of both mentally ill patients and the health care professionals that treat them."[117]  Even voluntary inpatients lose some autonomy and liberty upon admission.  For example, after a voluntary inpatient requests in writing to be released from care, the facility is permitted to detain the patient for seventy-two hours.[118]  Additionally, a facility may seek to convert a voluntary admission to an involuntary admission when warranted.[119]  The formal application process contained in the MHPA and implemented through the Regulations was designed to ensure that patients, including voluntary patients, knowingly consent to limited examination, treatment, and restrictions, all while being fully informed of their rights.  These due process concerns can be honored only through the enforcement of the process mandated by the MHPA and its prerequisites for voluntary inpatient care.[120]

---

[116]    50 P.S. § 7102.

[117]    *Leight*, 243 A.3d at 145 (Wecht, J., concurring).

[118]    50 P.S. § 7203.

[119]    *Id.* § 7206.

[120]    The Majority dismisses my concern for its inadequate accommodation of the due process rights of the mentally ill.  Maj. Op. at 40, n. 35.  But the Majority's decision that the Act triggers liability exposure under Section 114 when a person requests voluntary inpatient admission threatens insufficient protection of these rights.  Clarity in the admission process is essential to protect the due process rights of the mentally ill.  The General Assembly has established a formal application process precisely to ensure that (continued…)

Under the Majority's analysis, a person becomes an inpatient whose care is subject to the Act, and whose liberty is constrained accordingly, even if there is no clinical reason for admission. According to the Majority, any patient who indicates that he or she is "submitting" himself of herself for inpatient examination has become a voluntary inpatient under the Act, a status that may cause the patient to lose control over what happens to his or her liberty. The medical decision to admit a patient is one that belongs to the healthcare providers, not to patients or their families. As we did in *Leight*, we should enforce the plain language of the MHPA, which mandates a written application to initiate the process for a voluntary inpatient admission.

The Majority relies upon the definition of "treatment" in Section 104, which includes "diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness,"[121] to hold that "voluntary inpatient treatment" includes a request for evaluation and diagnosis. Not so. Although the Act broadly defines "treatment," this definition does not address the admission process for patients. "Treatment," as defined in Section 104, is formulated when the treatment team[122] devises the individualized treatment plan required by Section 107. This occurs after all of the procedural prerequisites to admission have been fulfilled, including both application by the person seeking treatment and acceptance by the facility.

---

patients knowingly consent to the examination, treatment, and restrictions to which they may be subjected, and to ensure treatment in the least restrictive setting consistent with adequate treatment. 50 P.S. 7102.

[121]     Maj. Op. at 30; 50 P.S. § 7104.

[122]     50 P.S. § 7106.

The Majority attempts to evade the logic of *Leight* by relying upon the presence of the word "written" in connection with involuntary admission in Section 302(a) and its absence in connection to voluntary inpatient admission in Section 202.[123]  This analysis disregards the requirement in Section 110 that *all* applications under the Act must be in writing.  It likewise disregards the other processes necessary for admission.  The Majority's interpretation reads Section 110 out of the Act and disregards Section 203's requirement of written consent prior to being accepted as a voluntary inpatient.

The Majority disregards Form MH-781, which "shall be" the "written application for voluntary inpatient treatment."[124]  The Majority believes that this form only captures the patient's written consent and is executed after admission and after a treatment plan has been developed.[125]  This is incorrect.  As explained above, the written application is a prerequisite to examination and treatment.[126]  A patient cannot be accepted for admission without a "written application for voluntary inpatient treatment,"[127] or, if the facility is state-operated, without the facility's satisfaction of certain regulatory prerequisites (including concurrence, a preexisting agreement of waiver, or preexisting letter agreement).[128]  Form-781 is completed before the "preliminary evaluation," and before admission, not

---

[123]     Maj. Op. at 34-35.

[124]     55 Pa. Code § 5100.72(a).

[125]     Maj. Op. at 38.

[126]     50 P.S. §§ 202, 110.

[127]     55 Pa. Code § 5100.72(a).

[128]     *Id.* § 5100.72(b).

after.[129]  Without a written application, there is no preliminary evaluation, no acceptance of the patient for inpatient admission, no inpatient status, and no examination or treatment under the Act.  Neither Geisinger nor Alley, therefore, "participate[d]" in a "decision" that a person be examined or treated under the Act.[130]

The Majority further opines that the entirety of Form MH-781 is designed to be executed only after a person has been accepted as a voluntary inpatient and after a treatment team formulates an individualized treatment plan because the form provides that, "[b]efore signing this form, your treatment should be explained to you and you must be given a copy of the patient's bill of rights."[131]  In the Majority's view, this statement indicates that a person is accepted for treatment, a treatment plan is developed, and then, and only then, does the patient consent as required by Form MH-781.

This is incorrect.  The statement on Form MH-781 implements Section 203.  Section 203 requires an explanation, statement of rights, and consent, "[b]efore a person is accepted for voluntary inpatient treatment," not after.  Section 203 requires the patient to be informed of the treatment "in which he **may** be involved."[132]  What treatment "may" be involved is the entire range of possible treatment.  The particular treatments and particular restraints to which the patient **will** be subject are developed in accord with Section 107 later in the process, after there is an application, explanation, statement of

---

[129]  *Id*. § 5100.72(c).  Indeed, Regulation 5100.72(c)(1) establishes Form 781-A to reflect the preliminary evaluation "in order to establish" whether voluntary commitment is medically warranted in the first place.

[130]  *See* 50 P.S. § 7114.

[131]  Maj. Op. at 41.

[132]  50 P.S. § 7203 (emphasis added).

rights, consent under Section 203, and acceptance. The Majority's understanding of the Section 203 consent required on Form MH-781 reflects a fundamental misunderstanding of the concept of informed consent under the Act.[133]

The Act mandates consent as an ongoing dialogue between the facility and its treatment team and the patient. The consent that Section 203 requires, and which is obtained on Form MH-781, is consent to the range of possible treatments, and it occurs prior to acceptance.[134] As the treatment plan is formulated—an event that occurs only after the patient has been preliminarily evaluated,[135] accepted for admission,[136] and subject to a physical examination[137]—the patient cooperates and consents to the treatment plan under Section 107.[138] The patient continues to consent on an ongoing basis as the treatment plan is reviewed periodically under Section 108,[139] which requires reevaluation of the treatment plan and of the patient at least every thirty days.[140] Under

---

[133] The Majority tells us that Form MH-781 is executed after an application, acceptance and admission for treatment, and the development of a treatment plan, Maj. Op. at 38, yet the Majority also asserts that Form MH-781 is completed after an application but before admission. *Id*. Contrary to the Majority's conflicting assertions, Form MH-781 is designated as the application for voluntary treatment. 55 Pa. Code § 5100.72(a). It is completed before acceptance, examination, development of a treatment plan, or treatment, as explained above.

[134]  50 P.S. § 7203.

[135]  55 Pa. Code § 5100.72.

[136]  50 P.S. §§ 203, 204, 205.

[137]  50 P.S. § 205.

[138]  50 P.S. § 7107. Indeed, the regulations require the treatment plan to "be formulated to the extent feasible, with the consultation of the patient." 55 Pa. Code § 5100.15(a)(1).

[139]  *Id*. §§ 7107, 7108.

[140]  *Id*. § 7108.

the Act, consent is an ongoing endeavor. To this end, Regulation 5100.15(c) requires the treatment plan to "be written in terms easily explainable to the lay person."[141] In the event that the patient objects to the treatment plan, each facility is required to maintain "a clearly defined appeal system" that the patient may utilize.[142]

The "consent" to the treatment plan that Section 107 requires is distinct from the "consent" to the possible range of treatment that Section 203 requires. Consent to the treatment plan under Section 107 is the informed consent that generally is required to the particular type of treatment proposed by the treatment team and premised upon the particular diagnosis, evaluation, therapy, or rehabilitative needs of the patient.[143] It occurs after acceptance. Contrary to the Majority's understanding, the consent to treatment that is given under Section 203 and Form MH-781 is given prior to acceptance as a means of protecting the due process rights of the mentally ill.

The MHPA establishes a formal, written application process. The Department's regulations provide further procedures to implement the MHPA. In order to participate in a decision that a person be examined or treated under the Act, a verified, written application must be made upon an approved form, a preliminary evaluation must determine whether treatment and further examination are needed, findings of the preliminary evaluation must be recorded upon an approved form, an explanation and patient's bill of rights must be provided, and the patient's written consent must be obtained. None of these requirements was alleged to be met with respect to either

---

[141] 55 Pa. Code § 5100.15(c).

[142] *Id.* § 5100.14.

[143] 50 P.S. § 7104.

Geisinger or Alley under the facts of this case. Neither defendant participated in a decision that a person be examined under the Act. Wise remained a voluntary outpatient and thus beyond the scope of the Act. Under *Leight,* anything that occurs prior to the application process described in the MHPA falls outside the scope of the statute.[144]

I respectfully dissent.

---

[144] *See Leight*, 243 A.3d at 145 (Wecht, J., concurring) ("As the Majority observes, the scope of the MHPA extends to the act of initiating the commitment process through the formal written procedures of the statute.").